## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**BRETT EUGENE HENKE, et al.,**

      **Plaintiffs,**

      **v.**

**DEPARTMENT OF THE INTERIOR,**

      **Defendant.**

**Civil Action No. 11-2155 (JEB)**

## MEMORANDUM OPINION

The background of this case will be familiar to those following news of the "Occupy Wall Street" protest and the progeny of protests it has spawned around the country. Since October 1, 2011, Plaintiffs Brett Henke and Laura Potter, along with numerous others, have participated in a protest, located in McPherson Square in Northwest Washington, DC, known as "Occupy DC." Am. Compl., ¶ 1. It is Plaintiffs' aim "to bring awareness to the[ir] concerns about United States economic policy, wealth disparity and the political process, through [a] peaceful, symbolic, round-the-clock occupation" of the Square by a tent city. Id., ¶¶ 12, 17. As Plaintiffs plan to continue their occupation "for an indefinite period of time," id., ¶ 18, they brought this action and an accompanying Motion for Preliminary Injunction to block the National Park Service from evicting them from the Square.

Eschewing any reliance on the First Amendment, Plaintiffs argue that their tents are protected from seizure and destruction by the Fourth and Fifth Amendments. See Mot. for PI at 2. As they have not shown any imminent actual injury that threatens their tents and as any future closing of the Square remains too hypothetical for the Court to address, Plaintiffs' request for injunctive relief will be denied.

## I.      Background

McPherson Square is a park within the National Park System.  See 36 C.F.R. §

7.96(g)(2)(ii)(B).  Plaintiffs, who have "occupied" the Square for several months, believe that its

close proximity to K Street, with its reputation as the home of corporate lobbying firms,

expresses their hope that "government will hear the voices of the people" and move toward a

more "economically egalitarian society."  Am. Compl., ¶¶ 1, 12.  On December 4, 2011, the

United States Park Police closed off a portion of the Square to create a security perimeter around

a large wooden structure that had been erected there.  See Opp. to PI, Exh. 1 (Declaration of

Kathleen Harasek, Captain, Park Police), ¶¶ 18, 19.  Plaintiff Brett Henke's tent was located

within the closed area of the Square, and he asserts he was separated from his property while the

Park Police removed the wooden structure.  Mot. for PI, Attach. 8 (Declaration of Brett Henke),

¶ 1.  He also asserts that members of Occupy DC were told by a Park Police officer that tents

located within the closed area of the Square would be removed.  Mot. for PI, Attach. 9

(Declaration of Jeffrey Light), ¶ 2.  It is undisputed that Plaintiffs' tents were not, in fact,

removed.

On December 5, 2011, Plaintiff Henke filed a Complaint alleging that the partial closing

of McPherson Square and any attendant seizure of his property had violated, and would in future

continue to violate, his First and Fourth Amendment rights.  See Compl., ¶¶ 24-29.  At that time,

Henke also sought, by temporary restraining order, to enjoin the Park Police from closing off

sections of McPherson Square to Plaintiff and the public except in an actual emergency, and

from searching and seizing Plaintiff's or other protesters' personal property without probable

cause.  See Mot. for TRO, Proposed Order at 1.

This Court held a hearing on Plaintiff's Motion for TRO on December 5, 2011, in which

an agreement was reached by both sides.  The Government indicated that it did not intend to

imminently evict Plaintiff from the Square.  The Court, accordingly, denied Plaintiff's Motion

for TRO provided that: 1) "The Government will provide 24-hour notice to the Court and

Plaintiff's counsel if it intends to enforce its regulations prohibiting camping or sleeping in

McPherson Square," and 2) "Absent such notice or exigent circumstances, the Government will

not restrict Plaintiff's access to the Square or his camping or sleeping in the Square."  ECF

Minute Order (Dec. 5, 2011).  The Court also set a briefing schedule for Plaintiff's Motion for

Preliminary Injunction.

  On January 4, 2012, Plaintiff filed an Amended Complaint, which added Laura Potter and

also named as Plaintiffs "all others similarly situated."  Am. Compl., ¶ 1.  Plaintiff Potter also

maintains a tent in McPherson Square.  See id., ¶ 5.  The Amended Complaint alleges that

Plaintiffs fear imminent eviction of the Occupy DC movement from the Square.  Id., ¶ 29.

Plaintiffs assert claims under the Fourth Amendment, to protect their rights to be free from

unreasonable seizure, including the confiscation and destruction of their tents, see id., ¶¶ 30, 37,

and under the Fifth Amendment's Due Process Clause, to prevent the seizure and destruction of

their tents without notice and an opportunity to be heard.  Id., ¶ 39.  Notably, Plaintiffs have not

reasserted their First Amendment claim.

  On January 4, 2012, Plaintiffs also filed a Motion for Preliminary Injunction seeking to

enjoin Defendant and its agents from "removing their tents from McPherson Square in violation

of their Fourth Amendment rights to be free from illegal seizures and destroying their tents in

violation of [their] Fifth Amendment right to due process of law."  Mot. for PI at 2.  Meanwhile,

on January 17, 2012, Plaintiffs moved to certify a class under Federal Rule of Civil Procedure

23.  The class would consist of "all members of Occupy DC having tents in McPherson Square

which have been or will be taken and/or destroyed by the Defendant or those acting in concert

with it." Am. Compl., ¶ 7.  The Government opposed Plaintiff's Motion for Preliminary

Injunction, and the briefing was completed by January 25.

On January 27, 2012, the Government issued to the protesters a Camping Enforcement

Notice indicating that it intended to begin enforcing its anti-camping regulations in the Square.

See Defendant's Notice of Filing, Exh. A (National Park Service Camping Enforcement Notice

For McPherson Square and Freedom Plaza) (ECF No. 17-1).  The Notice gave demonstrators

almost 72-hours' notice, rather than the 24-hours' notice required by the Court, that, as of noon

on January 30, those in McPherson Square who violated NPS's camping ban would be "subject

to arrest and their property subject to seizure."  Id.  The tents, unless deemed to be a bio-hazard,

would be impounded and could be reclaimed at the Park Police's District One Station.  Id.  In

issuing this Camping Enforcement Notice, the Government fully satisfied its obligations under

the Court's December 5 Order.

Upon learning of NPS's Camping Enforcement Notice, the Court conducted a conference

call on January 27 with counsel for both sides.  During the call, the parties agreed, and the Court

thus ordered, that the "Park Police, consistent with the Notice, may, as of noon on Jan. 30, 2012,

begin enforcing the Park Service's anti-camping regulations, including arresting those persons in

McPherson Square who are in violation of those regulations and seizing for temporary

impoundment their tents and other possessions."  ECF Minute Order (Jan. 27, 2012).

The Court heard argument on the remaining issues raised in this Motion – namely,

Plaintiff's claims regarding destruction of any tents, as well as the potential seizure of tents and

personal belongings of people in McPherson Square who are not violating the anti-camping

regulation – on January 31, 2012, and now issues this opinion.

## II.     Legal Standard

A preliminary injunction "is an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  Winter v. Natural Res. Def. Council, Inc., 129 S. Ct. 365, 376 (2008).  "A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest."  Id. at 374.  Before the Supreme Court's decision in Winter, courts weighed the preliminary injunction factors on a sliding scale, allowing a weak showing on one factor to be overcome by a strong showing on another.  See Davenport v. Int'l Bhd. of Teamsters, 166 F.3d 356, 360-61 (D.C. Cir. 1999).  This Circuit, however, has suggested, without deciding, that Winter should be read to abandon the sliding-scale analysis in favor of a "more demanding burden" requiring Plaintiffs to independently demonstrate both a likelihood of success on the merits and irreparable harm.  See Sherley v. Sebelius, 644 F.3d 388, 392 (D.C. Cir. 2011); Davis v. Pension Benefit Guar. Corp., 571 F.3d 1288, 1292 (D.C. Cir. 2009).

Whether sliding-scale analysis still exists or not, courts in our Circuit have held that "if a party makes no showing of irreparable injury, the court may deny the motion for injunctive relief without considering the other factors."  CityFed Financial Corp. v. OTS, 58 F.3d 738, 747 (D.C. Cir. 1995), cited in Dodd v. Fleming, 223 F. Supp. 2d 15, 20 (D.D.C. 2002); see also Wisconsin Gas Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam) ("We believe that analysis of the [irreparable harm] factor  disposes of these motions and, therefore, address only whether the petitioners have demonstrated that in the absence of a stay, they will suffer irreparable harm.").

### III.   Analysis

Given that Plaintiffs must demonstrate irreparable harm to prevail here, the Court starts with that analysis.  "The irreparable injury requirement erects a very high bar for a movant." Coalition for Common Sense in Gov't Procurement v. United States, 576 F. Supp. 2d 162, 168 (D.D.C. 2008) (citing Varicon Int'l v. OPM, 934 F. Supp. 440, 447 (D.D.C. 1996)).  The "alleged injury must be certain, great, actual, and imminent."  Hi-Tech Pharmacal Co., 587 F. Supp. 2d at 11 (citing Wisconsin Gas, 758 F.2d at 674).  While the deprivation of a constitutional right, "'for even minimal periods of time, unquestionably constitutes irreparable injury,'" Mills v. District of Columbia, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (quoting Elrod v. Burns, 427 U.S. 347, 373 (1976)), Plaintiffs nevertheless must show such that some action or event giving rise to such a violation is likely to occur.  In order to obtain a preliminary injunction, Plaintiffs must "provide proof that the harm has occurred in the past and is likely to occur again, or proof indicating that the harm is certain to occur in the near future."  Wisconsin Gas, 758 F.2d at 674 (emphasis added).  Injury that is hypothetical or speculative does not rise to the level of irreparable harm.  Id. (injury "must be actual and not theoretical").  Courts will not grant injunctive relief "against something merely feared as liable to occur at some indefinite time." Id.

The factual and legal questions in this case arise at the intersection of Plaintiffs' constitutional rights and the National Park Service's binding regulations.  On the one hand, the Constitution protects Plaintiffs' right to "be secure in their . . . effects[] against unreasonable searches and seizures" under the Fourth Amendment and not to "be deprived of . . . property[] without due process of law" under the Fifth Amendment.  U.S. CONST. amends. IV; V, cl. 3.  On the other, the Department of the Interior, through the National Park Service and within constitutional limits, "is charged with responsibility for the management and maintenance of the National Parks and is authorized to promulgate rules and regulations for the use of the parks in

accordance with the purposes for which they were established." Clark v. Community for Creative Non-Violence, 468 U.S. 288, 289 (1984). In doing so, the Government has a "substantial interest in maintaining the parks in the heart of our Capital in an attractive and intact condition, readily available to the millions of people who wish to see and enjoy them by their presence." Id. at 296.

NPS regulations permit demonstrations like Occupy DC to be held in McPherson Square, provided that "the conduct of such demonstrations is reasonably consistent with the protection and use of the indicated park area and the other requirements of this section." 36 C.F.R. § 7.96(g)(2)(ii)(B). Temporary structures such as tents may be erected as part of such a demonstration "for the purpose of symbolizing a message or meeting logistical needs such as first aid facilities, lost children areas or the provision of shelter for electrical and other sensitive equipment or displays." Id., § 7.96(g)(5)(vi). Tents may not, however, be used in McPherson Square as "living accommodation[s]" – i.e., for camping. Id.

Plaintiffs concede that violating NPS's anti-camping regulation would subject them to arrest and their tents to reasonable seizure. See Mot. for PI at 1-2; ECF Minute Order (Jan. 27, 2012). Their "suit does not seek to prohibit such hypothetical arrests as unconstitutional under the First Amendment, as "[s]uch an argument would be foreclosed" by the Supreme Court's decision in Clark v. CCNV, 468 U.S. 288. Id. at 2. This is a wise concession because Clark indeed forecloses a First Amendment argument here. The Supreme Court there held that the First Amendment did not protect people protesting homelessness by sleeping in tents in Lafayette Park in contravention of NPS's anti-camping regulation. Clark, 468 U.S. at 294-99. While the Court recognized that "sleeping, like the symbolic tents themselves, may be expressive and part of the message delivered by the demonstration," the anti-camping regulations were

appropriate content-neutral, time-place-and-manner restrictions.  Id. at 294-96.  The Court

concluded that camping in the park would be "totally inimical" to "the Government's substantial

interest in maintaining the parks in the heart of our Capital in an attractive and intact condition,

readily available to the millions of people who wish to see and enjoy them by their presence."

Id. at 294, 296.  Despite its potential to limit expression, therefore, NPS's anti-camping

regulation is nonetheless constitutional.

This concession does not foreclose Plaintiffs' present claims.  Plaintiffs here contend that

the "mere possibility that some individuals who are part of Occupy DC may be in violation of

the camping regulation does not mean . . . that the government may evict everyone from the park

and summarily seize and destroy their tents and other personal property."  Mot. for PI at 2.

Plaintiffs' Motion thus presents three issues for the Court.  First, Plaintiffs assert that even if

their tents are seized in connection with their lawful arrest, they may be denied due process if the

Park Police destroys the tents without notice or a meaningful opportunity for retrieval.  See id. at

15-17.  Second, Plaintiffs maintain that the seizure of tents belonging to members of the Occupy

DC demonstration who are not violating any laws or NPS regulations, other than in an

emergency, would also violate the Fourth Amendment.  See id. at 13.  Finally, in the event NPS

decides to close McPherson Square under 36 C.F.R. § 1.5 and seizes tents in connection with

such a closure, Plaintiffs argue that NPS lacks constitutionally adequate standards for making the

determination to close the park and for notifying interested parties of the closure, and for making

the decision to seize personal property in connection with the closure.  See Mot. for PI at 2;

Reply at 7.  The Court will address each in turn.

A.     Destruction of Tents

Plaintiffs' first alleged impending injury arises from their assertion that NPS lacks

standards governing the maintenance and destruction of confiscated personal property and their

fear that if their tents are seized, they will be destroyed without notice to Plaintiffs or an adequate opportunity for Plaintiffs to reclaim them.  See Mot. for PI at 15-18.

Plaintiffs are not incorrect that, in the abstract, they are due some process before their property can be destroyed.  The "due process clause requires, at minimum, that the government provide notice and some kind of hearing before final deprivation of a property interest."  Propert v. District of Columbia, 948 F.2d 1327, 1331 (D.C. Cir. 1991).  Plaintiffs have not, however, shown that, even if seized, their property is likely to be destroyed.

On the contrary, NPS regulations provide for the safekeeping and return of impounded property.  See 36 C.F.R. § 2.22.  "Found or impounded property shall be inventoried to determine ownership and safeguard personal property."  Id., § 2.22(b)(3).  NPS must preserve impounded property for at least 60 days.  See id.,§ 2.22(c).  It also maintains a manual that describes in further detail the procedures USPP officers must follow when impounding personal property.  See Harasek Decl., Exh. A (Guideline Manual, Evidence/Property), ECF No. 13-1 at 14 ("This Guideline Manual sets forth procedures and responsibilities for the handling of evidence/found property.").  The Manual provides: "The Force shall be responsible for safeguarding all property taken into custody until it is either released to the rightful owner or disposed of in accordance with applicable regulations."  Id. at 17.

The Government represented to this Court during the hearing on this Motion that NPS and the USPP intend to abide by these regulations.  See Hearing Tr. at 9:23-25.  This representation is bolstered by their actions to date regarding the Occupy DC demonstration.  On January 27, 28, and 29, 2012, Park Police officers posted and distributed "Camping Enforcement Notice[s]" in McPherson Square, notifying demonstrators:

> On or about **noon, January 30, 2012,** if camping violations are observed, individual violators may be subject to arrest and their

> property subject to seizure as evidence.  Any temporary structure
> used for camping also will be subject to seizure as an abatement of
> a public nuisance, <u>and may be reclaimed by the property owner
> between the hours of 8:00 a.m.-5:00 p.m. at the Park Police D-1
> Station located at 960 Ohio Drive, S.W., Washington, D.C. 20024,
> if done within 60 days.</u>  Items determined to be trash or a bio-
> hazard, however, will be disposed of as refuse, so you are advised
> to promptly dispose of any such items.

<u>See</u> Notice by Department of the Interior re Order on Motion for TRO, Exh. A (National Park

Service Camping Enforcement Notice dated January 27, 2012), ECF No. 17-1 (bold in original,

underlining added).

Plaintiffs have thus not shown any certain, imminent threat that their tents will be

destroyed at all, let alone without notice or an opportunity to reclaim them.  To the extent

Plaintiffs have provided evidence of isolated incidents of Park Police officers destroying

confiscated personal property in the past, they have certainly not established that this is the

USPP's policy, and they have made no "showing that there is a substantial risk that future

violations will occur," as is required for a grant of injunctive relief.  <u>Long v. District of

Columbia</u>, 469 F.2d 927, 932 (D.C. Cir. 1972); <u>see also</u> <u>Wisconsin Gas</u>, 758 F.2d at 674 (to

obtain injunction of basis of past incidents of harm, Plaintiffs must show harm "likely to occur

again").  "In order to show a substantial likelihood of future conduct" on the part of the Park

Police, "a clear pattern of [such conduct] must be shown.  Such a pattern should consist of

frequent acts of misconduct by police officers, which acts were known to the superior officers of

the police force."  <u>Long</u>, 469 F.2d at 932; <u>see also</u> <u>Washington Mobilization Committee v.

Cullinane</u>, 566 F.2d 107, 122 (D.C. Cir. 1977) (police department "cannot be charged with the

aberrations of a comparative handful of individual policemen").  As Plaintiffs have shown no

likelihood of future harm to their tents, they have not demonstrated that injunctive relief is

warranted to prevent such injury.  In such circumstances, they have not satisfied the irreparable

harm standard.

       B.      <u>Seizure of Tents from Law-Abiding Demonstrators</u>

Plaintiffs' claims regarding the potential seizure of tents belonging to Occupy DC

protestors who are in compliance with all laws and NPS regulations suffer from the same

infirmity as their claims regarding the destruction of tents – the occurrence of the injury is

wholly speculative and thus does not clear the hurdle of irreparable harm.

The "touchstone of the [Fourth] Amendment is reasonableness," and whether a seizure

is reasonable under the Fourth Amendment "depends upon the facts and circumstances of each

case."  <u>United States v. Proctor</u>, 489 F.3d 1348, 1352 (D.C. Cir. 2007) (quoting <u>United States v.</u>

<u>Askew</u>, 482 F.3d 532, 538 (D.C. Cir. 2007) (rev'd on other grounds); <u>South Dakota v.</u>

<u>Opperman</u>, 428 U.S. 364, 375 (1976)) (internal quotations omitted).  The seizure of Plaintiffs'

property could, depending on the attendant factual circumstances, conceivably constitute a

Fourth Amendment violation.  <u>See Soldal v. Cook County, Illinois</u>, 506 U.S. 56, 68 (1992)

("[A]n officer who happens to come across an individual's property in a public area could seize

it only if Fourth Amendment standards are satisfied – for example, if the items are evidence of a

crime or contraband.").

The Government has, however, disavowed any present intent to seize items from Occupy

DC demonstrators who are complying with the law.  <u>See</u> Hearing Tr. at 17:4-10 and 17:23-18:2.

Plaintiffs have submitted declarations from individuals participating in the demonstration to

support their claims that a handful of tents, structures, or instruments of protest have already

been seized, damaged, or destroyed by Park Police officers without adequate notice and

according to standards perceived by Plaintiffs to be arbitrary.  The facts surrounding these

alleged incidents, however, remain murky.  Defendants have provided alternative accounts or

explanations for some of these incidents, while disavowing knowledge of others.  See Hearing

Tr. at 28:3-5, 30:13-31:1; Opp. at 16-18.  Even if the Court accepts Plaintiffs' anecdotal

evidence, this does not establish a policy or practice of the Park Police to seize personal property

from law-abiding protesters, absent an emergency.  Without such evidence, Plaintiffs cannot

establish that future unreasonable seizures are actually likely, as opposed to speculative.  They

have thus failed to satisfy the requirement that their harm be actual and imminent.

     C.     Seizure of Tents in Connection with a Park Closure

The final issue urged by Plaintiffs concerns NPS's hypothetical future decision to close

all or a portion of McPherson Square in accordance with its authority under 36 C.F.R. § 1.5 and

to seize tents, either those left behind by departed demonstrators or still occupied by non-

compliant demonstrators, in connection with such a closure.

NPS regulations permit the park superintendent to "close all or a portion of a park area to

all public use or to a specific use or activity."  36 C.F.R. § 1.5(a)(1).  The decision to do so,

however, must be:

> based upon a determination that such action is necessary for the
> maintenance of public health and safety, protection of
> environmental or scenic values, protection of natural or cultural
> resources, aid to scientific research, implementation of management
> responsibilities, equitable allocation and use of facilities, or the
> avoidance of conflict among visitor use activities.

Id., § 1.5(a).  Except in emergency situations, the superintendent must prepare a written

determination justifying the closure and provide notice to the public.  Id., §§ 1.5(c), (e).

"Violating a closure, designation, use or activity restriction or condition, schedule of visiting

hours, or public use limit is prohibited" and may be punishable as a criminal offense.  Id., §

1.5(f); see also United States v. Cocoman, 903 F.2d 127, 128 (2d Cir. 1990).

Plaintiffs contend that NPS lacks adequate standards for implementing § 1.5; may improperly close the park by exceeding its authority under that section, thereby rendering any ensuing seizures unreasonable; or may do so without first giving proper notice and an opportunity to be heard, thereby denying Plaintiffs the process they are due.  This issue, however, is not now properly before the Court.  Plaintiffs conceded at the hearing that this issue is not ripe, see Hearing Tr. at 24:1-6, and indeed it is not.

Article III of the United States Constitution limits the jurisdiction of the federal courts to resolving "Cases" and "Controversies," U.S. CONST. art. III, § 2, cl. 1, and "'does not allow a litigant to pursue a cause of action to recover for an injury that is not "certainly impending."'" Full Value Advisors, LLC v. SEC, 633 F.3d 1101, 1106 (D.C. Cir. 2011) (quoting Wyoming Outdoor Council v. U.S. Forest Service, 165 F.3d 43, 48 (D.C. Cir. 1999) (internal quotation omitted)).  The doctrine of ripeness exists to ensure compliance with Article III and "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements."  Abbott Laboratories v. Gardner, 387 U.S. 136, 148 (1967), overruled on other grounds, Califano v. Sanders, 430 U.S. 99 (1977).  "In order to determine whether a controversy is ripe, a court must 'evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'"  Pfizer, Inc. v. Shalala, 182 F.3d 975, 978 (D.C. Cir. 1999) (quoting Texas v. United States, 523 U.S. 296, 301 (1998)).

In terms of fitness, a claim "'is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all.'"  Id. (quoting Texas, 523 U.S. at 300).  In other words, the "'fitness' prong of the analysis generally addresses 'whether the issue is purely legal, whether consideration of the issue would benefit from a more concrete setting, and whether the agency's action is sufficiently final.'"  Teva Pharmaceuticals

13

USA, Inc. v. Sebelius, 595 F.3d 1303, 1308 (D.C. Cir. 2010) (quoting National Ass'n of Home

Builders v. U.S. Army Corps of Engineers, 440 F.3d 459, 463 (D.C. Cir. 2006)).

Here Plaintiffs' claim is wholly contingent upon a hypothetical future event: NPS's

making a decision to invoke § 1.5, close all or a portion of McPherson Square, and order the

Occupy DC demonstrators to remove all tents and personal property.  Consistent with NPS's

position thus far, at the hearing on this Motion the Government disavowed any present intent,

absent an emergency, to close the Square.  See Hearing Tr. at 17:18-19.  NPS has thus neither

taken a final agency action nor even indicated any intent to imminently do so.  In the absence of

any factual information indicating why such a decision might be made or how it would be carried

out, it is impossible for this Court to evaluate Plaintiffs' claims, which are therefore presently

unfit for review.

Neither are Plaintiffs likely to suffer any hardship by the Court's decision to withhold

consideration of this issue under the second prong of the ripeness test.  Section 1.5(e) provides

that, "[e]xcept in emergency situations, the public will be informed of closures, designations, and

use or activity restrictions or conditions, visiting hours, public use limits, public use limit

procedures, and the termination or relaxation of such, in accordance with § 1.7 of this chapter."

Section 1.7(a), in fact, provides different methods that NPS may employ in informing the public.

Plaintiffs expressed concern at the hearing that one of these methods, publication in a

newspaper, see § 1.7(a)(3), would not provide sufficient notice to satisfy the Fifth Amendment.

See Hearing Tr. at 20:8-15.  Indeed, the Supreme Court has interpreted the Due Process Clause

to require notice that is "'reasonably certain to inform those affected . . . or, where conditions do

not reasonably permit such notice, that the form chosen is not substantially less likely to bring

home notice than other of the feasible and customary substitutes.'"  Propert, 948 F.2d at 1334

(quoting <u>Mullane v. Central Hanover Bank & Trust Co.</u>, 339 U.S. 306, 315 (1950)).  At the

hearing on this Motion, the Government represented that, in the event it decided to close the

park, NPS would at the least comply with the notice provisions described in § 1.7(a)(1), which

requires posting and distributing flyers to the Occupy DC demonstrators.  <u>See</u> Hearing Tr. at

20:22-21:16.  In fact, this is the method NPS used to notify the demonstrators of the park's no-

camping regulation on October 26, November 23, and December 30, 2011, and of NPS's notice

of its intent to begin enforcing the camping ban, distributed on January 27, 28, and 29, 2012.

<u>See</u> <u>id.</u>; <u>see also</u> Defendant's Notice of Filing, Exhs. A-D (NPS Notices) (ECF No. 17-1).  The

Court has no reason to suspect NPS would deviate from this method of providing notice in the

future, except in emergency situations.  The Government also indicated at the hearing that

counsel would file such a closure notice with the Court through ECF, thus ensuring receipt by

Plaintiffs' counsel.  <u>See</u> Hearing Tr. at 23:7-10.  Plaintiffs agreed that this was adequate notice

under the Fifth Amendment to alert them of any non-emergency NPS decision to close

McPherson Square to the Occupy DC demonstrators.  <u>Id.</u> at 22:3-5, 24:1-6.

     In light of the pre-closure notice required by §§ 1.5(e) and 1.7(a), the Court finds that

Plaintiffs will have ample opportunity to return to Court in order to challenge or enjoin any

future decision by NPS to close the park.  Section 1.5(c) requires that, "[e]xcept in emergency

situations, prior to implementing or terminating a restriction, condition, public use limit or

closure, the superintendent shall prepare a written determination justifying the action."  If

Plaintiffs believe NPS's future closure decision – should it occur – to be arbitrary and capricious,

or otherwise unlawful or unconstitutional, they can challenge that decision under the

Administrative Procedure Act, 5 U.S.C. §§ 706(A)-(D), at that time.  <u>See</u> <u>Mausolf v.</u>

<u>Babbitt</u>, 125 F.3d 661, 669 (8th Cir. 1997) (36 C.F.R. § 1.5(a) "is subject to the arbitrary-and-

capricious standard of review").  The Court, at this juncture, however, is hardly in a position to review the basis of such future closure decision when NPS has not yet articulated any reasons, let alone decided to promulgate such closure.

The issue before this Court, moreover, must be distinguished from those presented in Occupy Boston v. City of Boston, No. 11-4152-G, slip op. (Sup. Ct. Mass. Nov. 17, 2011) (memorandum opinion to order denying motion for preliminary injunction), and Occupy Fort Myers v. Fort Myers, No. 11-608, 2011 WL 5554034 (M.D. Fla. Nov. 15, 2011) (granting in part and denying in part motion for preliminary injunction), in which courts found Occupy demonstrators' motions for injunctive relief to be ripe for judicial review.  See Occupy Boston, No. 11-4152-G, slip op. at 9; Occupy Fort Myers, 2011 WL 5554034, at *14-15.   In both of those cases, the plaintiffs had challenged the constitutionality of particular ordinances or regulations, rather than the legality of potential future agency action.  Those challenges thus presented defined legal issues, ones that remain amorphous in the factual context of the present case.  In sum, the Court cannot resolve a controversy that is so far from ripe.

## IV.    Conclusion

As the Court, therefore, finds that Plaintiffs' claims regarding the potential future closure of McPherson Square, and any attendant hypothetical Fourth and Fifth Amendment violations, are not ripe for adjudication at this time, and as Plaintiffs have not established any imminent actual injury regarding the seizure or destruction of their tents and other personal property, the Court will issue a contemporaneous order denying Plaintiffs' Motion for a Preliminary Injunction.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  February 2, 2012